**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

HARRIS EMANUEL FORD,    )
            )
      Plaintiff,  )
            )
     v.      )   1:19cv444
            )   UNDER SEAL
ERIK A. HOOKS, et al.,    )
            )
      Defendants. )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on (1) "DPS Defendants' Motion for Summary Judgment" (Docket Entry 23) (the "DPS Motion"); (2) "Plaintiff Harris Ford's Motion for Summary Judgment" (Docket Entry 28) ("Plaintiff's Motion"); (3) Defendant Cameron E. Gaddy's "Motion for Summary Judgment" (Docket Entry 36) (the "Gaddy Motion"); and (4) "DPS Defendants' Motion to Seal Response in Opposition to Plaintiff's Motion for Summary Judgment" (Docket Entry 46), "Plaintiff's Motion for Leave to File Under Seal Portions of Plaintiff's Consolidated Response to Defendants' Motions for Summary Judgment and Exhibits Attached Thereto" (Docket Entry 50), and "Plaintiff's Motion for Leave to File Under Seal Portions of Plaintiff's Reply in Support of His Motion for Summary Judgment" (Docket Entry 55) (collectively, the "New Sealing Motions"). For the reasons that follow, the Court should grant the

DPS Motion in part, grant the Gaddy Motion in full, deny Plaintiff's Motion, and deny the New Sealing Motions without prejudice.

BACKGROUND

## I. Procedural History

Alleging violations of his rights under the Eighth Amendment, Harris Emanuel Ford (the "Plaintiff") commenced this action against Erik A. Hooks, Kenneth E. Lassiter, J.C. Huggins, Jr.,[1] Katy Poole, Dean Locklear, Karen L. Henderson, Queen Gerald, Jerry Ingram, and Gaddy (collectively, the "Defendants") pursuant to 42 U.S.C. § 1983. (See Docket Entry 1 (the "Complaint"), ¶¶ 1-28, 128-35.) Defendants answered the Complaint, asserting various defenses (including qualified immunity) and denying liability for Plaintiff's injuries. (See Docket Entry 6 at 1-2, 15-18.)[2]

Thereafter, the parties engaged in discovery (see Text Order dated Sept. 19, 2019 (adopting, with one clarification, joint Rule 26(f) Report); Docket Entry 16 (Joint Motion to Amend Scheduling Order, indicating progress of discovery to that point)), after which all parties moved for summary judgment. Defendants Hooks, Lassiter, Poole, Locklear, Henderson, Gerald, and Ingram (collectively, the "DPS Defendants") together sought judgment in

---

[1] Plaintiff has since voluntarily dismissed his claim against Defendant Huggins. (Docket Entry 7 at 1.)

[2] Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.

-2-

their favor on all claims (see Docket Entry 23), whereas Defendant Gaddy separately moved for the same relief (see Docket Entry 36). Plaintiff filed a consolidated response opposing Defendants' motions. (See Docket Entries 48 (redacted), 51 (unredacted).) Defendants replied. (See Docket Entries 57 (Defendant Gaddy), 58 (DPS Defendants).)

Plaintiff's Motion, which seeks summary judgment against six Defendants (Poole, Locklear, Henderson, Gerald, Ingram, Gaddy)[3] likewise stands fully briefed. (See Docket Entries 44 (redacted), 45, 47 (unredacted), 53 (redacted), 56 (unredacted).)

## II. Allegations

In this action, Plaintiff challenges Defendants' failure to heed his requests for protective custody or otherwise ensure his safety while incarcerated at Scotland Correctional Institution ("SCI"). (See Docket Entry 1, ¶¶ 1-13.) According to the Complaint:

Plaintiff has resided in North Carolina prisons since 2002. (Id., ¶ 29.) In 2006, Plaintiff expected to serve as a government witness in a murder prosecution, but a guilty plea resolved the charges and obviated the need for Plaintiff's testimony. (Id., ¶ 30.) Still, "Plaintiff expressed to the [District Attorney]

---

[3] Plaintiff's summary judgment brief omits any reference to the other two Defendants, Hooks and Lassiter, both of whom Plaintiff sued in their "official capacit[ies] for injunctive and declaratory relief" (Docket Entry 1, ¶¶ 17-18). (See Docket Entry 33.)

-3-

concerns about his safety in light of his potential cooperation with the State." (Id.)  Upon a written request by the District Attorney, the Department of Corrections moved Plaintiff to SCI. (Id., ¶ 31.)

When Plaintiff arrived at SCI, "United Blood Nation gang members at SCI branded [him] as an informant (a 'snitch') and issued a 'kill on sight' order." (Id., ¶ 32.)  Staff at SCI learned about the threat, removed Plaintiff from the general population, and eventually transferred him to another facility. (Id., ¶¶ 34, 37.)  The pattern of threats resulting in Plaintiff's transfer repeated itself several times between 2008 and 2017. (See id., ¶¶ 38–41.)

The Department of Corrections moved Plaintiff back to SCI on March 15, 2017. (Id., ¶ 42.)  That same day, Plaintiff received another threat, which prompted him to advise staff about "the incident and his problems with the United Blood Nation gang" and to request protective custody. (Id., ¶¶ 43–45.)  In the weeks that followed, staff initially isolated Plaintiff but ultimately denied his request and ordered him to return to general population. (Id., ¶¶ 46–49.)  Plaintiff opted to comply rather than receive the disciplinary measure known as Intensive Control (ICON) status, which would have resulted in modified housing and the loss of various privileges. (Id., ¶¶ 49–52.)  Plaintiff learned from

-4-

prison staff that he would receive ICON status "if he requested [protective custody] without providing names." (Id., ¶ 53.)

Over the next two months, United Blood Nation-affiliated inmates continued to threaten Plaintiff, who attempted to appease them with "food, toiletries, and stamps from the canteen." (Id., ¶ 57.) In April or May 2017, two such affiliated inmates attacked Plaintiff in his cell and warned him not to report his injuries. (See id., ¶¶ 58-59.) Plaintiff initially complied but requested protective custody twice more in May 2017 after receiving additional threats and remaining in the same unit where the attack had occurred. (Id., ¶¶ 60-63, 75.) Prison staff denied both requests, and Plaintiff complied with the order to return to general population. (Id., ¶¶ 69-70, 79-80.)

In response to each denial of protective custody, Plaintiff filed a grievance. (Id., ¶ 81.) Several grievances challenged Plaintiff's continued assignment to general population and prison staff's handling of his grievances. (Id., ¶¶ 86-100.) Plaintiff also wrote numerous letters and submitted forms raising his concerns to individuals inside and outside SCI. (Id., ¶ 104.) Prison staff denied Plaintiff's grievances, and he remained in general population, though in a different unit than where the spring 2017 attack occurred. (Id., ¶¶ 86-105.)

"[O]n September 24, 2017, a United Blood Nation-affiliated inmate named Jamal McRae ran into [Plaintiff's] cell while

-5-

[Plaintiff] was on his bunk and attacked [Plaintiff], stabbing him on his face, head, neck, ear, eye, and finger." (Id., ¶ 107.) Plaintiff went to the hospital for his injuries, where "[he] received over 100 stitches for his scalp, neck, and facial lacerations." (Id., ¶ 110.) Additionally, "[Plaintiff] needed physical therapy to regain normal movement in his hand and fractured finger." (Id.)

When Plaintiff returned from the hospital, prison staff temporarily isolated him, though he spent a brief period in general population. (Id., ¶¶ 111, 114–15.) Plaintiff continued to file grievances about his safety at SCI until his transfer out of that facility around November 2017. (See id., ¶¶ 111, 116–18.)

Based on the above events, the Complaint contends that all Defendants, in violation of the Eighth Amendment, "deprived [Plaintiff] of a safe environment." (Id., ¶ 133.) In particular, Plaintiff sued Defendants Hooks and Lassiter in their official capacities (id., ¶¶ 17–18), arguing that they "were willfully and deliberately indifferent to [Plaintiff's] safety by failing to establish or enforce effective policies and practices at SCI" (id., ¶ 129). Plaintiff sued the remaining six Defendants in their individual capacities (id., ¶¶ 21–26), asserting that they "subjected [him] to conditions that posed a significant risk of serious bodily harm or death" (id., ¶ 130). The Complaint alleges that, despite "ha[ving] actual and constructive notice of the

-6-

significant risk of serious harm to [Plaintiff, these Defendants] acted with deliberate indifference to that risk." (Id., ¶ 132.) According to the Complaint, "[a]ll Defendants' failure to provide a safe environment . . . caused [Plaintiff's] serious physical, mental, and emotional injuries." (Id., ¶ 134.)

### III. The Record

In support of their respective positions, the parties submitted numerous exhibits including affidavits; Plaintiff's institutional records, including the history of his transfers, housing assignments, and infractions; Plaintiff's requests for protective custody and corresponding reports; various letters; Plaintiff's grievances and the responses; institutional records relating to the September 24, 2017 assault; McRae's disciplinary history; Plaintiff's medical records; photographs of Plaintiff's injuries; Defendant Gaddy's responses to interrogatories; and excerpts from several depositions. As relevant to the motions for summary judgment, the record reflects the following:

### A. Plaintiff's History

Plaintiff was convicted in 2004 for first-degree rape and received a 129-year sentence. (Docket Entry 25-2 at 2.) According to a letter from District Attorney Seth Edwards, in 2006, Plaintiff submitted to an interview with prosecutors concerning a then-pending Martin County murder case. (Docket Entry 30-1 at 2.) Plaintiff shared with prosecutors information he had learned from

−7−

Mickey Rollins, the murder suspect, during their incarceration together. (Id.) Plaintiff's assistance led to the discovery of a potential murder weapon. (Id.) District Attorney Edwards planned to call Plaintiff as a witness, but Rollins pleaded guilty shortly before trial. (Id. at 3.)

District Attorney Edwards communicated this same information to the head of the North Carolina prison system in October 2006. (Docket Entry 30-2 at 2.) The letter relays Plaintiff's preference for a transfer away from Central Prison (which could have housed Rollins post-conviction). (Id.) According to District Attorney Edwards, "[Plaintiff] requested a move . . . to the Scotland County prison to be closer to his family." (Id.)

Although it remains unclear where Plaintiff resided at every point since his 2004 conviction, his sworn statement indicates (and transfer history corroborates) that he lived at SCI between January 2, 2008, and July 16, 2008. (See Docket Entry 30, ¶ 4; Docket Entry 34-2 at 2.) Plaintiff avers that, during this time, SCI staff learned that United Blood Nation gang members had ordered a hit on Plaintiff (as a result of his status as a "snitch"). (Docket Entry 30, ¶¶ 5-6.) This incident resulted in Plaintiff's transfer to a different institution, and Plaintiff recalls multiple threats to his life and several safety-related transfers in the years that followed. (See id., ¶¶ 6-7.)

Plaintiff returned to SCI on March 15, 2017. (Id., ¶ 8.)

-8-

> As soon as [he] entered the Blue Unit cell block, an
> inmate told [him] to "check off or get blowed." That
> meant [he] would be attacked with a shank if [he] didn't
> request protective custody (PC). The inmate added,
> "That's word to Blood," meaning that the threat was from
> the United Blood Nation gang. [Plaintiff] didn't know the
> name of the inmate who made that statement to [him]
> because [he] had just arrived at SCI.

(Id., ¶ 9.)

### B. Requests for Protective Custody and Grievances

Plaintiff immediately reported the foregoing threat to Defendant Ingram (the Unit Manager) and requested protective custody. (Id., ¶ 10.) According to the Policy and Procedures of the North Carolina Department of Public Safety:

> Protective control is the reassignment of an inmate from
> the general population to confinement in a secure area to
> protect the inmate involved from self injury or threat of
> harm by others. An inmate's request to be placed in
> protective control does not alone constitute grounds for
> reassignment. The officer in charge must evaluate all the
> circumstances of each case. A determination must be made
> that the inmate's request is legitimate and that
> Restrictive Housing is necessary for the continued
> well-being of the inmate. The only purpose for protective
> control is the protection of the inmate when it is
> apparent that the inmate's life or well-being may be
> threatened if the subject remains in the general
> population.

(Docket Entry 31-16 at 2.) The Policy establishes procedures governing such decisions and limits the length of time an inmate may remain in "protective control" housing. (Id. at 2–4.)

Plaintiff participated in an interview and gave a written statement in support of his request for protective custody. (Docket Entry 26-3 at 2.) The written statement explains that

-9-

Plaintiff resided at SCI in 2008 before "Unit Manager Covington shipped [him] out due to the fact Bloods had a hit on [him]." (Id. at 5.) In the statement, Plaintiff maintained that the "issue still exists" and that "[his] person [was] in danger." (Id.) The assigned investigator, Defendant Ingram, recommended denial after deeming the request "insufficient due to [Plaintiff] not providing any names of the inmates, who allegedly put a hit out on him." (Id. at 2.) SCI assistant superintendent William Bullard signed Defendant Ingram's report. (Id. at 3.)

On March 28, 2017, Plaintiff filed a grievance in response to the denial of protective custody to "document[] exactly what [he was] going through with this situation." (Docket Entry 26-9 at 3–4.) The applicable policy manual provided that "[a]ny aggrieved inmate may submit a written grievance on Form DC-410." (Docket Entry 49-8 at 2.) After preliminary screening of such grievances, prison staff must prepare an initial written response and attempt to resolve the matter with the inmate. (Id. at 2–3.) The administrative process allows for two phases of additional review if the inmate's concern persisted. (Id. at 3–4.)

Plaintiff's grievance describes an unpalatable choice between giving names ("sni[t]ch[ing]") and "sign[ing] a refusal [of protective custody]." (Docket Entry 26-9 at 3–4.) The grievance further explains that "[t]hese gangs will send anyone to stab [or] cut [Plaintiff]," that he knew no names, and that "[he had] no way

-10-

of [giving] this information." (Id. at 4–5.) Plaintiff clarified that he knew only nicknames and advised that staff at his last camp ("CCI") "told [him] that they had info[rmation] about a hit on [his] life and had [him] sign a statement." (Id. at 5.)

In the Step One grievance response on April 5, 2017, Defendant Gaddy expressed that "[Plaintiff] did not provide information that would allow a proper investigation to be conducted. [He] also did not state what events le[d] up to a[n] active hit being placed on his person." (Id. at 6.) That same day, in the Step Two response, Defendant Locklear "agree[d] with [S]tep [O]ne respon[se]" and recommended "no further action." (Id. at 7.) On April 28, 2017, at Step Three, an inmate grievance examiner (not a party to this action) reviewed the earlier steps and concluded "that staff ha[d] adequately addressed [Plaintiff's] grievance concerns." (Docket Entry 34-26 at 2.)

Sometime during April 2017, United Blood Nation gang members threatened Plaintiff for the second time since his March 2017 arrival at SCI. (Docket Entry 30, ¶¶ 9, 17.) They told him "to 'pay rent' or 'get blowed,'" which "meant that [he] needed to give them food, toiletries, and stamps or else [he] would get stabbed with a shank." (Id., ¶ 17.) Despite Plaintiff's compliance with this demand, "[a] few weeks later, two Bloods attacked [him] with a shank in [his] cell on the Blue Unit as they called [him] a 'snitch.'" (Id., ¶¶ 17–18.) Plaintiff declined to report his

-11-

injuries for fear of retribution and instead "continued to 'pay rent' to avoid further attacks." (Id., ¶ 18.)

On May 3, 2017, Special Operations and Intel at the Department of Prisons received a letter ("First DPS Letter") from Plaintiff. (Docket Entry 34-35 at 2.) The First DPS Letter warns the recipient ("Mr. Solomon") that SCI inmates had created weapons and asks that prison staff "conduct a major search." (Id.) The First DPS Letter further advises that Plaintiff "fear[ed] for [his] safety" and that staff had denied him protective custody. (Id.) A DPS employee forwarded the First DPS Letter to Defendant Poole on May 18, 2017, and she responded (via the "correspondence tracking system") by asking Defendant Gerald and another employee to investigate the allegations and "ensure that a [protective custody] investigation has been completed." (Id. at 5; Docket Entry 34-36 at 2.) More than two years later, Defendant Gerald entered a note in the system stating the reasons for the denials of protective custody. (See Docket Entry 34-35 at 5 ("[Plaintiff] did not provide any names or additional information to support his allegation."); Docket Entry 34-36 at 2 (same).)

On May 13, 2017, Plaintiff received another threat and again requested protective custody. (Docket Entry 26-4 at 4 ("This is the second time I've requested protective custody and this time I request it due to the fact it's been [sic] a hit placed on my life. . . ."); Docket Entry 30, ¶ 19 ("[A]nother inmate told me to

-12-

'check off or die.'").) In this second request, Plaintiff named the person against whom he had cooperated but referenced neither the spring 2017 attack nor the threat communicated that day. (<u>See</u> Docket Entry 26-4 at 4.)

Sergeant McDonald (not a party to this action) investigated and generated a report. (<u>See</u> <u>id.</u> at 2.) According to Plaintiff, as part of the investigation, he showed McDonald and Defendants Gaddy and Henderson letters from District Attorney Edwards corroborating the basis for the threat to his life. (Docket Entry 30, ¶ 20.) Defendant Gaddy has denied that Plaintiff offered any "paperwork" to substantiate his request and has maintained that Plaintiff refused to make a statement. (Docket Entry 34-10 at 12; Docket Entry 36-1 at 2.) In his report, McDonald acknowledged that Plaintiff had "provide[d] documentation stating where he testified against [Rollins]" but recommended denial after deeming this information "insufficient . . . to support [Plaintiff's] request for protective custody." (Docket Entry 26-4 at 2.) Staff apparently completed the investigation on May 23, 2017. (<u>Id.</u>)

On May 19, 2017, Plaintiff filed a second grievance, asserting that he "[was] very concerned for [his] safety." (Docket Entry 26-10 at 2.) According to the grievance, that same day Plaintiff "offered [Defendant Gaddy] the information and documentation to substantiate [his protective custody] request." (<u>Id.</u>) As a remedy, Plaintiff asked that SCI officials "instruct staff to offer

-13-

protection whenever it's requested."  (Id.)  A non-party prison official received the grievance on May 21, 2017.  (Id.)

On May 24, 2017, the Communications Office of the DPS received a letter ("Second DPS Letter") from Plaintiff copied to Defendants Hooks and Lassiter, United States District Court Judge Louise W. Flanagan, the United States Department of Justice Prison Litigation Section, and the Scotland County District Attorney's Office. (Docket Entry 34-37 at 2–3.)  The Second DPS Letter describes Plaintiff's history of protective custody requests and repeats the assertion (from Plaintiff's second grievance) that, on May 19, 2017, he gave Defendant Gaddy documents to support his protective custody request.  (Id. at 2.)  The Second DPS Letter explains Plaintiff's role as a cooperator in the 2006 murder prosecution, requests an out-of-state transfer to avoid harm from United Blood Nation gang members, and references the spring 2017 attack in his cell.  (Id. at 2–3.)  The record contains no response to this letter.

On May 25, 2017, "[Defendant] Ingram came to [Plaintiff's] cell and yelled at [him] for requesting [protective custody]. Within earshot of other inmates on the unit, [Defendant] Ingram demanded to know who [Plaintiff] thought was a threat. [Plaintiff] refused to answer his public questioning."  (Docket Entry 30, ¶ 24.)  That same day, Plaintiff sought protective custody for a third time on the grounds that "all the inmates heard what was said

-14-

[by Defendant Ingram] and now . . . want to harm [him]" for being a "snitch." (Docket Entry 26-5 at 3.) In that third request, Plaintiff claimed to "have documentation and information" to "give to the investigating staff," including the identity of some inmates with whom Plaintiff had problems. (Id.) Plaintiff stated he would give "this information directly to [Defendant] Gerald in a statement." (Id. at 3-4.)

On May 27, 2017, Jamie Hammonds (not a party to this action) investigated Plaintiff's request. (Id. at 6.) Hammonds, like the two officers who had handled the earlier investigations, advised against protective custody because Plaintiff failed to provide any names or documentation. (Id.) Assistant superintendent Bullard signed off on this report on June 19, 2017. (Id.)

In the meantime, Plaintiff filed his third and fourth grievances, on May 27, 2017, and June 13, 2017, respectively. (See Docket Entries 26-11, 34-51.) The third grievance describes Plaintiff's first protective custody request and the spring 2017 incident when two inmates stabbed Plaintiff in the back. (Docket Entry 34-51 at 2, 4.) Additionally, the grievance details what happened after the threat on May 13, 2017, including the submission of Plaintiff's second protective custody request and his offer of documentation to Defendant Gaddy. (Id. at 4-5.) Furthermore, the grievance challenges prison staff's alleged mishandling of another

-15-

grievance Plaintiff had attempted to file on May 21, 2017. (<u>Id.</u> at 3.)

The grievance further explains that Plaintiff had "offered documents supporting [his protective custody] request to [Defendant] Henderson through [McDonald]," who returned Plaintiff's materials and stated that the matter "was out of his hands." (<u>Id.</u> at 3, 6.) When Plaintiff returned to general population, he initially received a segregated housing assignment, but Defendant Henderson supposedly ordered him back to Blue Unit on May 25, 2017. (<u>See</u> <u>id.</u> at 6–7.) The grievance relates that, after Defendant Ingram confronted Plaintiff in his cell and demanded more information about the threats and Plaintiff's fear for his life, Plaintiff gave two statements, including one in which he named inmates with whom he had problems and agreed to "identify the others via picture roster." (<u>Id.</u> at 8–10.) Plaintiff recalled that this conversation occurred with "Sgt. Hunt," a non-party to this action. (<u>See</u> <u>id.</u> at 10.) Defendant Gerald received this grievance on June 1, 2017, but staff rejected it on screening the next day, because Plaintiff's second grievance remained pending at that time. (<u>See</u> <u>id.</u>; Docket Entry 34-52 at 2.)

The fourth grievance lodges the following complaints: SCI staff denied Plaintiff a pillow, an extra mattress (as prescribed), and an opportunity to see an unspecified policy manual; the lights remained "off all day every day;" Plaintiff received permission to

-16-

clean only once per week; the vents emitted a mildew smell and housed dirt and trash; SCI staff failed to handle Plaintiff's grievances in a timely fashion or at all; Plaintiff lacked access to a law library; Plaintiff had "been denied protection;" inmates possessed weapons as a result of staff's failure to conduct searches or "prevent access to material to fashion these weapons that are used regularly" during assaults; SCI experienced understaffing and failed to lock down as necessary. (Docket Entry 26-11 at 2-7.) Plaintiff concluded the grievance with "notice of [his] intent to sue." (Id.) Defendant Gerald received this grievance on June 14, 2017. (Id.)

After Plaintiff returned to general population following the denial of his third request for protective custody, staff addressed his second and fourth grievances. As concerns the second grievance, on July 6, 2017, Defendant Henderson's Step One response references Plaintiff's intervening request for protective custody and the resulting denial. (Docket Entry 26-10 at 4.)[4] At Step Two, on July 11, 2017, Defendant Locklear "agree[d]" and counseled "no further action." (Id. at 5.) At Step Three, on July 17, 2017, review by another (non-party) inmate grievance examiner resulted in dismissal. (Id. at 6.) As concerns the fourth grievance,

_____

[4] The Step One response states that McDonald investigated Plaintiff's third request for protective custody, whereas the report itself identifies Hammonds as the investigating officer. (Compare Docket Entry 26-10 at 4, with Docket Entry 26-5 at 6.) McDonald recommended denial of Plaintiff's second request for protective custody. (See Docket Entry 26-4 at 2.)

-17-

Defendant Gerald's Step One answer on July 5, 2017, addressed many of Plaintiff's complaints with reference to SCI policy. (See Docket Entry 26-11 at 8.) At Step Two, on July 11, 2017, Defendant Locklear concurred with Defendant Gerald's response. (Id. at 9.) At Step Three, on July 17, 2017, the examiner found no policy violation and dismissed the grievance. (Id. at 10.)

### C. Attack on September 24, 2017

Surveillance video captured part, but not all, of the events surrounding the attack. The recording of "Green C block" begins at 4:02:51 p.m. and ends at 4:31:34 p.m. (See Docket Entry 26-7.) The foreground depicts a common area with tables, chairs, and mounted television monitors. (Id.) Cells border the common area on each side, and two staircases allow access to two second-story walkways. (Id.) On both the first and second story, cells line each side of the hallway, which extends away from the camera's vantage point. (Id.) Dark green sliding doors cover the entrance of each cell. (Id.) The footage appears somewhat grainy, such that the viewer cannot discern details like any inmate's physical features or the contents or occupants of any cell. (Id.)

For approximately twenty minutes, the recording shows dozens of unidentifiable inmates on the first floor interacting with one another and milling around in front of the television monitors. (Id. at 4:02:51–4:24:53.) Various inmates walk up and down the

stairways and disappear from view into cells or down the hallway. (See id.)

At 4:24:54 p.m., on the left side of the second-story walkway, McRae quickly exits a cell (presumably Plaintiff's) and crouches, reaching toward the ground. (Id. at 4:24:54–4:24:57.) He then proceeds down the walkway (toward the camera) while lifting his shirt over his head. (Id. at 4:24:57–4:25:04.) He slides open the door to a cell (presumably his own) and tosses inside his shirt and another item (removed from the area around his head). (Id. at 4:25:04–4:24:10.) He then advances down the same walkway in the direction of Plaintiff's cell, with his hands near his waist. (Id. at 4:25:10–4:25:18.) For approximately ten seconds, McRae stands or paces in the area immediately outside Plaintiff's cell but does not re-enter Plaintiff's cell or fully disappear from the camera's view. (Id. at 4:25:18–4:25:28.) McRae then returns to his cell, goes inside, and eventually closes the door partially, reappearing in the doorway several times but not leaving his cell in the time leading up to prison staff's discovery of Plaintiff's injuries. (Id. at 4:25:28–4:28:55.) In sum, the recording fails to capture any part of the attack itself and documents only McRae's post-attack exit from Plaintiff's cell. As a result, the time and manner of McRae's entry into Plaintiff's cell remain subject to dispute, and the parties offer conflicting accounts of what preceded the attack.

-19-

According to Plaintiff's affidavit, "inmate Jamal McRae ran into [Plaintiff's] cell while [Plaintiff] was preparing food and attacked [Plaintiff] with a shank. [McRae] stabbed [Plaintiff] in the face, head, neck, ear, eye, and hand dozens of times before [Plaintiff] was able to fend him off. McRae then ran out of [Plaintiff's] cell." (Docket Entry 30, ¶ 34.) In another, later-filed affidavit, Plaintiff averred that "[he] did nothing to provoke McRae's attack." (Docket Entry 54, ¶ 4.)

Per Defendant Gaddy, McRae reported that he "act[ed] in self-defense" (Docket Entry 37 at 3), in connection with events more fully related by DPS Defendants (see Docket Entry 24 at 5-6). In support of that view of the incident, DPS Defendants tendered records from the investigation and disciplinary proceedings that followed the assault. (See Docket Entry 26-6.) In response to one of Plaintiff's interrogatories, Defendant Gaddy recalled that McRae "reported . . . attack[ing] [Plaintiff] over a dispute regarding . . . legal services." (Docket Entry 41 at 3; see also id. ("Legal papers prepared by [Plaintiff] on behalf of [McRae] were found in [Plaintiff's] cell and taken into evidence by the Laurinburg Police Department.").)

As to whether gang affiliation motivated McRae's attack, Plaintiff has asserted that McRae's disciplinary history shows previous association with the United Blood Nation (see Docket Entry 33 at 16), whereas DPS Defendants have challenged Plaintiff's lack

of evidence that the assault constituted "a gang hit" (<u>see</u> Docket Entry 24 at 9-11). Defendant Gaddy has argued (and testified in his deposition) that McRae's status as a sex offender would have rendered him ineligible for gang membership. (<u>See</u> Docket Entry 37 at 2-3.) Moreover, Defendant Gaddy attached as an exhibit excerpts from his own deposition in which he described his investigation into the incident and interviews with informants that led him to disbelieve Plaintiff's account of the attack as gang-related. (<u>See</u> Docket Entry 36-1.)

### D. Events Following the September Attack

After prison staff discovered Plaintiff's injuries, they transported him to the hospital for treatment. (Docket Entry 30, ¶ 35.) As a result of McRae's conduct, a hearing officer found him guilty of the disciplinary offense of assault with a weapon. (Docket Entry 26-6 at 4-5.) In the criminal proceeding involving related criminal charges (assault with deadly weapon and assault inflicting serious injury), McRae pleaded guilty (pursuant to <u>Alford</u>). (Docket Entry 49-5 at 2-9.)

On October 16, 2017, Plaintiff filed a fifth grievance raising concerns about his safety at SCI. (<u>See</u> Docket Entry 34-44.) The grievance spans seven pages and relates parts of the above chronology, beginning with Plaintiff's arrival at SCI in March 2017. (<u>See</u> <u>id.</u> at 2-8.) The topics include the history of his protective custody requests and grievances, as well as the spring

attack (including Plaintiff "inform[ing] staff of what happen[ed"). (Id. at 2-3.) Plaintiff summarized that "[he] continuously informed staff from the first day [he] came [to SCI] the [United Blood Nation] gang had a hit on [his] life because they believe [he] informed against them and others." (Id. at 5.) Plaintiff also mentioned the September 2017 attack and the subsequent order to return to general population. (Id. at 6-7.) As a remedy, Plaintiff requested a transfer to "Central Prison" or "Tabor," a lockdown of SCI, "a thorough search for weapons and/or . . . protective custody," and "staff[ing of SCI] as mandated by policy." (Id. at 2.)

On November 1, 2017, Bullard provided the Step One response wherein he advised Plaintiff that "[he was] scheduled to be transferred from [SCI] in the near future." (Docket Entry 34-45 at 2.) The response further notes that Plaintiff then resided in "restrictive housing," and concluded that Plaintiff was "not in danger." (Id.) After Plaintiff appealed to Step Two, on November 29, 2017, Defendant Locklear recommended "no further action." (Docket Entry 34-46 at 2.) The record does not contain the Step Three response.[5]

Plaintiff transferred from SCI to another facility on or around November 1, 2017. (See Docket Entry 34-2 at 2.)

---

[5] Instead, the record reveals a Step Three response relating to a different grievance, apparently filed November 6, 2017, in which Plaintiff "complain[ed] about missing property as a result of staff negligence." (Docket Entry 34-47 at 2.)

<u>DISCUSSION</u>

**I. Relevant Standards**

**A. Summary Judgment**

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing absence of such dispute. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." <u>Henry v. Purnell</u>, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" <u>Miller v. Leathers</u>, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists

-23-

and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, 4:08-cv-2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Baber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). Finally, factual allegations in a complaint or court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

"When faced with cross-motions for summary judgment, the [C]ourt must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th

-24-

Cir. 2003) (quoting <u>Philip Morris Inc. v. Harshbarger</u>, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).  The Court considers each motion individually and "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." <u>Id.</u> (quoting <u>Wightman v. Springfield Terminal Ry. Co.</u>, 100 F.3d 228, 230 (1st Cir. 1996)).

**B. Eighth Amendment**

"The Eighth Amendment prohibits the infliction of 'cruel and unusual punishments.'" <u>Iko v. Shreve</u>, 535 F.3d 225, 238 (4th Cir. 2008) (quoting U.S. Const. amend. VIII).  "It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." <u>Helling v. McKinney</u>, 509 U.S. 25, 31 (1993).  The Eighth Amendment requires that prison officials "provide humane conditions of confinement," which includes, among other things, "tak[ing] reasonable measures to guarantee the safety of the inmates." <u>Farmer v. Brennan</u>, 511 U.S. 825, 832–33 (1994) (quoting <u>Hudson v. Palmer</u>, 468 U.S. 517, 526-27 (1984)).  To that end, officials must "protect prisoners from violence at the hands of other prisoners."  <u>Brown v. North Carolina Dep't of Corr.</u>, 612 F.3d 720, 722-23 (4th Cir. 2010) (quoting <u>Farmer</u>, 511 U.S. at 833). But, "[n]ot every injury suffered by a prisoner at the hands of another establishes liability against a prison official." <u>Id.</u> at 723.

-25-

"In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.'" <u>Strickler v. Waters</u>, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting <u>Williams v. Griffin</u>, 952 F.2d 820, 824 (4th Cir. 1991)). "In order to demonstrate such an extreme deprivation, a prisoner must allege 'a serious or significant physical or emotional injury resulting from the challenged conditions,' or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." <u>De'Lonta v. Angelone</u>, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation and citations omitted). The inquiry into the serious deprivation "should be informed by objective factors to the maximum extent." <u>Strickler</u>, 989 F.2d at 1379 (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 346 (1981)). Moreover, "an inmate must specifically describe not only the injury but also its relation to the allegedly unconstitutional condition." <u>Id.</u> at 1381 n.9.

With regard to the second prong, deliberate indifference,

a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

-26-

Farmer, 511 U.S. at 837. "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" Iko, 535 F.3d at 238.

"Deliberate indifference is a very high standard[, and] . . . mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). To satisfy this standard, a plaintiff must make "two showings":

> First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers *should have* recognized it; they actually must have perceived the risk. Second, the evidence must show that the official in question subjectively recognized that his [or her] actions were inappropriate in light of that risk. As with the subjective awareness element, it is not enough that the official *should have* recognized that his [or her] actions were inappropriate; the official actually *must have* recognized that his [or her] actions were insufficient.

Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (internal citations and quotation marks omitted) (emphasis in original). "A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence that a prison official knew of a substantial risk from the very fact that the risk was obvious." Scinto v. Stansberry, 841 F.3d 219, 226 (4th Cir. 2016) (internal quotation marks omitted). A plaintiff can also establish "a prima

-27-

facie case of deliberate indifference" where "'a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it.'" Id. (brackets and ellipsis in original) (quoting Parrish, 372 F.3d at 303).

In other words, "[p]rison officials are deliberately indifferent if they are aware that 'the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so.'" Cox v. Quinn, 828 F.3d 227, 236 (4th Cir. 2016) (quoting Brown, 612 F.3d at 723). On the other hand, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844. Phrased "in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." Id. at 845.

## C. Section 1983

"Under [Section] 1983, a state actor may be liable if he 'subjects, or causes to be subjected' an individual 'to the deprivation of any rights, privileges, or immunities secured by the Constitution.' As a general matter, a law officer may incur

-28-

[Section] 1983 liability only through affirmative misconduct." Randall v. Prince George's Cty., 302 F.3d 188, 202 (4th Cir. 2002) (quoting Parratt v. Taylor, 451 U.S. 527, 535–36 (1981)). "[Section] 1983 must be 'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977) (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)). "[I]t must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (quoting Vinnedge, 550 F.2d at 928)).

## II. Analysis

### A. The Summary Judgment Motions

#### 1. The DPS Motion

DPS Defendants have sought summary judgment on the grounds that Plaintiff can prove neither causation nor deliberate indifference, each a necessary showing for his eighth-amendment claim. (See Docket Entry 24 at 2.) The brief in support of the DPS Motion asserts that Plaintiff's own conduct precipitated McRae's attack and that McRae's alleged gang involvement played no role. (Id. at 9–11.) That brief further argues that Plaintiff has failed to satisfy either prong of the eighth-amendment inquiry: that Plaintiff faced a substantial risk of serious harm or that DPS Defendants knew about and disregarded this risk. (Id. at 15–19.)

-29-

In particular, that brief emphasizes that the initial threat preceded the attack by more than ten years and that Plaintiff's failure to provide sufficient information to prison officials hindered their investigation. (Id. at 16–18.) According to that brief, Plaintiff's forecast of evidence amounts to no more than mere negligence on the part of each Defendant. (Id. at 18–19.) Additionally, that brief contends that Defendants Poole and Locklear bear no Section 1983 liability given their minimal participation in the alleged deprivation. (Id. at 11–14.) Finally, that brief claims entitlement to summary judgment for Defendant Lassiter because he has retired, leaving him without "authority to enforce any injunctive relief the Court may provide." (Id. at 19.)

In his consolidated response opposing both defense motions for summary judgment, Plaintiff addressed each of the above arguments. First, Plaintiff's response cites Federal Rule of Civil Procedure 25(d) for the proposition that Defendant Lassiter's successor, Todd Ishee, automatically replaces Defendant Lassiter as a party upon the latter's retirement. (Docket Entry 51 at 5 n.1.) Plaintiff's response further challenges DPS Defendants' reliance on inadmissible hearsay to argue that Plaintiff's conduct caused McRae to attack him. (Id. at 17–21.) According to Plaintiff's response, he has satisfied the first prong of the eighth-amendment inquiry (substantial risk of serious harm) because an associate of the

United Blood Nation gang actually inflicted serious injuries upon Plaintiff. (Id. at 21–22.) With respect to the second prong (deliberate indifference), Plaintiff's response highlights the supposed obviousness of the risk and the failures by Defendants Poole, Locklear, Ingram, Gaddy, Henderson, and Gerald to properly investigate Plaintiff's concerns. (Id. at 22–26; see also id. at 26 ("It was eminently foreseeable that Ford—who alerted the [individual-capacity] Defendants to a Blood threat on his life and begged for protection—would be stabbed by a member or associate of the Bloods.").) Finally, Plaintiff's response asserts waiver as to any argument for summary judgment by the official-capacity Defendants (Hooks and Ishee) because the brief in support of the DPS Motion fails to address Plaintiff's official-capacity theory. (Id. at 27–28.)

### 2. The Gaddy Motion

Adopting by reference portions of the DPS Motion's accompanying brief, the brief in support of the Gaddy Motion advocates for judgment in Defendant Gaddy's favor on grounds similar to the DPS Motion. (See Docket Entry 37 at 2.) Defendant Gaddy's brief maintains that McRae's assault did not stem from gang affiliation and that no Defendant displayed "a 'sufficiently culpable state of mind.'" (Id. at 2–3 (quoting Farmer, 511 U.S. at 834).) Plaintiff's consolidated response affords no individualized treatment to the Gaddy Motion, instead contending that "[the DPS

-31-

Motion and the Gaddy Motion] fail for the same reasons." (Docket Entry 51 at 5 n.2.)

### 3. Plaintiff's Motion

Plaintiff has requested entry of judgment in his favor against the six individual-capacity Defendants: Poole, Locklear, Henderson, Gerald, Ingram, and Gaddy. (See Docket Entry 29 at 5.) Plaintiff's brief in support argues that the conditions of Plaintiff's confinement at SCI posed a substantial risk of serious harm; that each Defendant disregarded the risk despite their awareness of it; and that qualified immunity fails to shield any of those Defendants from Section 1983 liability. (Id. at 18-27.)

More specifically, Plaintiff's summary judgment brief maintains that "[Plaintiff] was at 'substantial risk' of serious harm because he *was* seriously harmed." (Id. at 19 (emphasis in original).) As proof of each Defendant's actual knowledge of that risk, Plaintiff's summary judgment brief points to his numerous requests for protective custody, grievances, and letters. (Id. at 19-22.) According to Plaintiff, the individual-capacity Defendants unreasonably disregarded the risk by failing to investigate and grant Plaintiff's requests for protective custody. (Id. at 22-25.) To overcome the qualified immunity defense, Plaintiff's summary judgment brief asserts that the undisputed facts establish an eighth-amendment violation and that "[Plaintiff's] right to protection from other inmates was clearly established in 2017."

-32-

(Id. at 25.)  Plaintiff's summary judgment brief contends that "[t]he factual circumstances in *Farmer*, *Makdessi* [*v. Fields*, 789 F.3d 126 (4th Cir. 2015)], and *Cox* are sufficiently 'similar' to this case that [Defendants Poole, Locklear, Henderson, Gerald, Ingram, and Gaddy] must have been on notice that their conduct was unlawful."  (Docket Entry 29 at 26-27.)

DPS Defendants responded in opposition, arguing that Plaintiff has not met his burden to show that the record would compel any reasonable juror to find in his favor.  (Docket Entry 44 at 2-3.) That response restates problems with Plaintiff's theory of causation, characterizes his logic as circular, and challenges the notion that DPS Defendants actually "form[ed] the opinion that Plaintiff was at risk."  (Id. at 4-7.)

Defendant Gaddy filed a separate response, disputing both "Plaintiff's bare allegation [that] the assault was gang-related" and Plaintiff's contention that his serious injury proves a substantial risk of serious harm.  (Docket Entry 45 at 3.) According to Defendant Gaddy's response, the individual-capacity Defendants lacked a "culpable state of mind" because "[they] did their best to ascertain whether a threat against Plaintiff existed and, if so, from whom."  (Id. at 3-4 (quoting Farmer, 511 U.S. at 834).)

-33-

**B. Preliminary Matters**

First, the parties have disputed what evidence the Court may consider to resolve their dueling dispositive motions. Plaintiff's consolidated response argues that "Defendants base their arguments [for summary judgment in their favor] on inadmissible hearsay." (Docket Entry 48 at 17.) In particular, Plaintiff's response challenges Defendants' reliance on McCrae's unsworn, out-of-court statements concerning the motive for the September 2017 attack. (Id. at 17-19.) In reply, DPS Defendants and Defendant Gaddy contended that McRae's narrative fits within one or more hearsay exceptions. (Docket Entry 57 at 2 n.1; Docket Entry 58 at 2 n.1.) According to Defendant Gaddy, numerous exceptions under Federal Rule of Evidence 803 "apply to both the statements made by McRae directly to [Defendant] Gaddy as well as the records generated by McRae and prison officials when interviewing him soon after the attack." (Docket Entry 57 at 2 n.1 (characterizing statements as present sense impressions, excited utterances, and then-existing mental and emotional conditions and asserting that documentary materials constitute business records and recorded recollections).)

"[T]he practical question presented by a motion for summary judgment is whether the case presents a genuine issue of fact for trial rather than whether the parties have put their evidence in final form." United States HUD v. Cost Control Mktg. & Sales Mgmt., 64 F.3d 920, 926 n.8 (4th Cir. 1995). "The [C]ourt may

-34-

consider materials that would themselves be admissible at trial, and the content or substance of otherwise inadmissible materials where the 'the party submitting the evidence show[s] that it will be possible to put the information . . . into an admissible form.'" Humphreys & Partners Architects, L.P. v. Lessard Design, Inc., 790 F.3d 532, 538 (4th Cir. 2015) (ellipses in original) (quoting 11 James Wm. Moore et al., Moore's Federal Practice § 56.91[2] (3d ed. 2015)); see also Jones v. Western Tidewater Reg'l Jail, 187 F. Supp. 3d 648, 654 (E.D. Va. 2016) ("[F]acts in support of or opposition to a motion for summary judgment need not be in admissible form; the [Rule 56] requirement is that the party identifies facts that could be put in admissible form." (internal quotation omitted)). Under Federal Rule of Civil Procedure 56 and the accompanying advisory committee note, "[i]f the nonmovant objects to the court's consideration of 'material cited to support or dispute a fact,' the movant has the burden 'to show that the material is admissible as presented or to explain the admissible form that is anticipated.'" Humphreys & Partners Architects, L.P., 790 F.3d at 538–39 (internal citations omitted).

Here, Defendants have not carried this burden. Turning first to Defendant Gaddy's forecasted testimony, the record reveals no "present sense impression" by McRae, who gave no "statement describing or explaining an event or condition, made while or immediately after . . . perceiv[ing] it." Fed. R. Evid. 803(1)

-35-

(emphasis added).  According to the video evidence and deposition testimony, no Defendant spoke to McRae in the moments immediately following the assault.  (See Docket Entry 26-7 at 4:25:28–4:28:55 (video showing McRae in his cell after attack); Docket Entry 36-1 at 4 (testimony from Gaddy denying presence at SCI when McRae attacked Plaintiff).)  Nor did McRae provide "[a] statement relating to a startling event or condition, made while . . . under the stress of excitement that it caused."  Fed. R. Evid. 803(2) (emphasis added).  On this score, Defendant Gaddy recalled McRae "tear[ing] up" during an interview but offers no time frame for this encounter.  (Docket Entry 57 at 2 n.1.)  Finally, to the extent any McRae statement describes what caused his mental or emotional condition, such statement fails to qualify under this exception because "statements about the declarant's reasons for having that state of mind are inadmissible."  United States v. Wenjing Liu, 654 F. App'x 149, 153–54 (4th Cir. 2016). Consequently, Defendant Gaddy's expected testimony concerning McRae's out-of-court statements constitutes inadmissible hearsay, an improper basis for summary judgment.

As concerns the documents themselves (such as the investigative file pertaining to the assault), neither proffered hearsay exception warrants admission of the materials.  Although the records themselves may qualify as business records, the documents contain embedded hearsay.  Specifically, by creating the

-36-

investigative file, prison staff made out-of-court statements (first-level hearsay); any statement within such file (such as McRae's conversations with staff) constitutes second-level hearsay. "[E]ach part of [a] combined statement[] [must] conform[] with an exception to the rule [against hearsay]." Fed. R. Evid. 805. As explained above, Defendants have failed to demonstrate a basis for admitting any of McRae's out-of-court statements. Finally, the exception for recorded recollections bears no relevance here. This exception requires a showing "that (1) the witness once had knowledge about the matters in the document, (2) the witness now has insufficient recollection to testify fully and accurately, and (3) the record was made at a time when the matter was fresh in the witness' memory and reflected the witness' knowledge correctly." United States v. Shorter, Nos. 98-4822, 98-4823, 1999 WL 631244, at *2 (4th Cir. Aug. 19, 1999). The record lacks any competent evidence that McRae no longer remembers his motive for the attack.

The briefing on this subject relates only to whether the Federal Rules of Evidence render inadmissible the material as presented. In other words, Defendants have failed to explain any anticipated admissible form of the evidence upon which they rely.[6] Under these circumstances, given that no hearsay exception permits the admission of Defendant Gaddy's testimony on this score or the records containing McRae's account, such material does not

---

[6] Defendants appear not to have deposed McRae or otherwise secured his sworn testimony.

constitute evidence upon which the Court can grant summary judgment.  For these reasons, this Recommendation depends on neither McRae's out-of-court statements via Defendant Gaddy nor the institutional records pertaining to the investigation (to the extent they contain inadmissible hearsay from McRae).

Second, as Plaintiff correctly has observed, by operation of Rule 25, Todd Ishee became a party upon Defendant Lassiter's retirement.  Fed. R. Civ. P. 25(d).  His joinder occurred automatically, without need for an Order from this Court.  See id. ("The court may order substitution at any time, but the absence of such an order does not affect the substitution.").  The Court should direct the Clerk to effect this substitution.

Third, Plaintiff appropriately has noted that, despite the asserted breadth of the DPS Motion, the supporting brief fails to challenge Plaintiff's official-capacity theory as to Defendants Hooks and Lassiter (now Ishee), whom Plaintiff sued for injunctive relief.  Under this Court's Local Rule 7.3, "[a]ll motions shall state with particularity the grounds therefor."  The Court should decline to grant summary judgment to the official-capacity Defendants because they have failed to present or develop an argument advocating this result.  See Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that [the party] elected not to do.").

-38-

**C. Plaintiff's Injury**

No Defendant has disputed that Plaintiff suffered serious physical injuries as a result of McRae's attack; however, questions remain about whether those injuries alone demonstrate that Plaintiff faced a substantial risk of serious harm and whether the attack occurred as a result of that risk.

As to the first question, Supreme Court authority clarifies that the failure-to-protect inquiry considers the seriousness of the <u>risk</u> of assault, not merely the extent of injury when an assault has already occurred. <u>See</u> <u>Farmer</u>, 511 U.S. at 834 ("For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a <u>substantial risk</u> of serious harm." (emphasis added)). "This objective inquiry 'requires a court to assess whether society considers the <u>risk</u> that the prisoner complains of to be so <u>grave</u> that it violates contemporary standards of decency to expose <u>anyone</u> unwillingly to such a risk.'" <u>Raynor v. Pugh</u>, 817 F.3d 123, 127 (4th Cir. 2016) (third emphasis in original) (quoting <u>Helling</u>, 509 U.S. at 36). However, the <u>Farmer</u> Court declined to decide the "point [at which] a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes." <u>Farmer</u>, 511 U.S. at 834 n.3. Absent further guidance from the Supreme Court, the United States Court of Appeals for the Fourth Circuit sometimes has assessed only the gravity of an injury for purposes of the first objective prong.

-39-

See Raynor, 817 F.3d at 128–29 (describing, "[f]or the objective-injury prong," parties' conflicting accounts of gravity of injury); Brown, 612 F.3d at 723 ("In this case, it is uncontested that [the plaintiff] suffered significant physical injuries as a result of the other inmate's attack."). Both Raynor and Brown considered the degree of risk as part of the second-prong deliberate indifference inquiry. See Raynor, 817 F.3d at 129–30; Brown, 612 F.3d at 723. In light of this binding precedent, for purposes of this matter, the Court should conclude that Plaintiff's showing of serious injury satisfies the objective prong. However, such a ruling fails to conclusively establish that Plaintiff faced a substantial risk of serious harm or that Defendants disregarded such risk.

As to causation of Plaintiff's injury, the parties disagree about (i) Plaintiff's supposed provocation of McRae's attack and (ii) McRae's alleged Blood affiliation. By affidavit, Plaintiff denies provoking McRae. (Docket Entry 54, ¶ 4.) In support of the opposite conclusion, Defendants rely in large part on inadmissible hearsay, which the Court should decline to consider for the reasons previously discussed. However, Defendants offer limited, seemingly admissible evidence to counter Plaintiff's sworn assertions: prison staff found McRae's legal materials in Plaintiff's cell (Docket Entry 41 at 3), and the video recording fails to show McRae running into Plaintiff's cell immediately before the attack (Docket Entry

26-7 at 4:24:54-4:24:57.).[7]  Such evidence cuts against the sudden,

unprompted encounter that Plaintiff suggests but fails to entitle

Defendants to summary judgment.[8]

As concerns the dispute about McRae's previous gang

affiliation, Plaintiff's brief depends almost exclusively upon

hearsay.  (See Docket Entry 33 at 16 (citing SCI disciplinary

records and investigative report following McRae's attack).)

Despite challenging Defendants' use of inadmissible evidence,

Plaintiff fails to acknowledge his own reliance on hearsay,

identify a hearsay exception, or propose the anticipated admissible

form of the material.  See Humphreys & Partners Architects, L.P.,

790 F.3d at 538 (describing evidence courts may consider for

---

[7]  Plaintiff's response on these subjects fails to overcome
the factual dispute.  First, the response asserts that the Court
should exclude as hearsay Defendant Gaddy's contention that
Plaintiff served as McRae's jailhouse lawyer.  (Docket Entry 48 at
19.)  True enough, McRae's statement on this point constitutes
hearsay, but the hearsay rule cannot shield from the jury
underlying non-hearsay facts (such as the discovery of McRae's
legal materials in Plaintiff's cell).  Second, Plaintiff's
response states that "the video skips shortly before the attack,
masking [McRae's] entrance [into Plaintiff's cell]."  (Id. at 13.)  The
recording (which skips periodically) permits that inference but
fails to foreclose the possibility that McRae spent significant
time in Plaintiff's cell prior to the attack (contrary to
Plaintiff's account).

[8]  In contrast, conclusive proof that Plaintiff provoked McRae
likely would doom Plaintiff's Motion and spell victory for
Defendants.  See Richardson v. Mitchell, No. 3:06cv48, 2008 U.S.
Dist. LEXIS 112415, at *13-16 (E.D. Va. Sept. 23, 2008) (dismissing
failure-to-protect claims by plaintiff who faced discipline for
fighting with other inmates); see also Hailey v. Kaiser, No.
99-7046, 1999 WL 1009614, at *2 (10th Cir. Nov. 8, 1999) (finding
no proximate or legal cause for Eighth Amendment claim brought by
inmate who admitted role as initial aggressor).

summary judgment purposes).  In any event, the Court should not view McRae's gang affiliation, if any, as outcome-determinative; Defendants may have acted with deliberate indifference even if McRae never associated with the Bloods, or Defendants may have acted reasonably even if McRae had such affiliation.

Ultimately, because these topics may involve credibility determinations, the Court should decline to adopt either side's version for purposes of any summary judgment motion.  Uncertainty over what caused McRae to attack Plaintiff (Plaintiff's provocation, McRae's gang affiliation, or something else) renders improper summary judgment for either party on this basis.

### D. Deliberate Indifference

As explained above, for purposes of deliberate indifference, the obviousness of a risk may support an inference of actual knowledge; an official may "not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." Farmer, 511 U.S. at 843 n.8.  To exemplify such a situation, Farmer hypothesized an official who possesses "a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation." See id.  "To establish that a risk is 'obvious' . . . a plaintiff generally is required to show that the defendant 'had been exposed to

-42-

information concerning the risk and thus must have known about it.'" <u>Danser v. Stansberry</u>, 772 F.3d 340, 348–49 (4th Cir. 2014) (quoting <u>Farmer</u>, 511 U.S. at 842).

However, a prison official may demonstrate deliberate indifference even without deeming an inmate "especially likely to be assaulted by the <u>specific prisoner</u> who eventually committed the assault." <u>Farmer</u>, 511 U.S. at 843 (emphasis added). Some risks to an inmate's health or safety appear clear even absent a particularized warning (or advance notice from the inmate at all). <u>See id.</u> at 848 ("[T]he failure to give advance notice is not dispositive. Petitioner may establish respondents' awareness by reliance on any relevant evidence."). In <u>Farmer</u>, the Supreme Court described Farmer as "a 'non-violent' transsexual who, because of [her] 'youth and feminine appearance' is 'likely to experience a great deal of sexual pressure' in prison." <u>Id.</u> (internal quotation omitted). In contrast, in <u>Makdessi v. Fields</u>, 716 F. App'x 148 (4th Cir. 2017), Makdessi's medical problems, stature, and age failed to constitute such an obvious risk. <u>See id.</u> at 154 ("The magistrate and district court did not clearly err in crediting [prison officials'] testimony as establishing that [they] believed that any risk suggested by Makdessi's physical condition 'was insubstantial or nonexistent.'" (quoting <u>Farmer</u>, 511 U.S. at 844)).

In instances when the inmate lacks a self-evident vulnerability, courts sometimes have discerned deliberate

-43-

indifference when officials ignored an inmate's requests for protection or failed to isolate inmates from their identified enemies. For example, the Fourth Circuit permitted an inmate's eighth-amendment claim to proceed when he alleged that a staff member directed him to retrieve cleaning supplies from a "Housing Block," despite the staff member's knowledge that the area housed another inmate who "harbored a grudge against [the plaintiff inmate]." Brown, 612 F.3d at 722. The other inmate attacked Brown after Brown complied with the staff member's order. Id. Similarly, the Fourth Circuit denied qualified immunity to prison officials who first disregarded an inmate's warning about other inmates who wanted to harm him and then ignored the inmate's pleas for help as the aggressors broke into his recreation cage and attacked him. Odom v. South Carolina Dep't of Corr., 349 F.3d 765, 767–68 (4th Cir. 2003).

Inversely, "prison officials cannot endeavor to protect an inmate from threats that the inmate refuses to identify or expound upon." Farmer v. Lyons, Civ. Action No. PWG-18-567, 2018 WL 3585208, at *4 (D. Md. July 26, 2018). Courts in the Fourth Circuit have granted summary judgment for prison officials in failure-to-protect cases when the officials lacked sufficient information concerning the threat perceived by an inmate. See, e.g., Mbewe v. C.D.C., No. AW-12-cv-3138, 2013 WL 4495816, at *4 (D. Md. Aug. 20, 2013) ("No detailed information regarding real or

-44-

potential threats or future acts of physical harm was communicated to MCIH staff prior to the July 2012 incident."). In <u>Brown v. Rowan County Detention Center</u>, No. 1:09-CV-573, 2012 WL 5338574 (M.D.N.C. Oct. 30, 2012), prison officials prevailed at summary judgment when the failure-to-protect claim arose from a denial of protective custody. <u>Id.</u> at *5-6. Brown had sought such a housing assignment based on "threatened gang violence," but never "provided specific information to any Defendant about who made threats against him or what those threats were." <u>Id.</u>

In light of the above principles, the Court should evaluate the information available to each Defendant, which depends (to a significant degree) on details provided by Plaintiff in his requests for protective custody and grievances. For purposes of the DPS Motion and the Gaddy Motion, the Court must decide (in light of the authority discussed previously) whether, viewing the evidence in the light most favorable to Plaintiff, any reasonable juror could determine that (i) Defendants actually knew about and disregarded a substantial risk to Plaintiff and (ii) that Defendants understood that their response to the risk remained inadequate. As concerns Plaintiff's Motion, the inquiry centers on whether, viewing the evidence in the light most favorable to Defendants, any reasonable juror could deny that Defendants acted with such deliberate indifference.[9] Given the forecast of evidence

_____

[9] A conclusion that the evidence supports a finding of deliberate indifference (thus denying summary judgment for

-45-

relating to each Defendant's subjective awareness, the Court should grant summary judgment for all six individual-capacity Defendants.

### 1. Defendant Poole

As evidence of Defendant Poole's subjective awareness of facts from which she must have inferred a substantial risk of serious harm, Plaintiff's summary judgment brief[10] points to the First DPS Letter in which he (i) requested a search of inmates for homemade weapons and (ii) contested the denial of his request for protective custody despite fearing for his safety. (Docket Entry 33 at 20; Docket Entry 34-35 at 2.) Viewed in the light most favorable to Plaintiff, the record shows that Defendant Poole, as the employee "responsible for the 'total operations' of the prison, including security," directed Defendant Gerald to address Plaintiff's concerns but failed to follow up. (Docket Entry 48 at 24 (quoting Docket Entry 34-7 at 4 and citing id. at 4, 6, as well as Docket Entry 34-55).)

On this record, no reasonable juror could find that Defendant Poole possessed the requisite awareness of a substantial risk to Plaintiff. The First DPS Letter says nothing of Plaintiff's status as a potential cooperator or his asserted fear of attack by a United Blood Nation gang member; instead, it states only that SCI

---

Defendants) permits but does not require judgment for Plaintiff.

[10] Plaintiff's consolidated response opposing Defendants' motions for summary judgment contains similar assertions. (Compare Docket Entry 33, with Docket Entry 51.)

inmates (in general) fashion weapons out of plastic cups and asks the recipient to "do something to control these gangs." (Docket Entry 34-35 at 2.) Faced with such a generalized complaint, Defendant Poole directed her subordinates to ensure a proper investigation, to respond to Plaintiff, and to file a copy of the response. The record contains no indication that Defendant Poole knowingly mishandled the matter. Even if a reasonable juror could conclude that Defendant Poole should have done more, no such juror could characterize her state of mind as "deliberate indifference." Therefore, the Court should grant summary judgment for Defendant Poole.

### 2. Defendants Locklear and Henderson

To show Defendant Locklear's deliberate indifference, Plaintiff's summary judgment brief highlights that Defendant Locklear declined to engage in meaningful review in providing the Step Two answer for three of Plaintiff's grievances. (Docket Entry 29 at 23-24.) As concerns Defendant Henderson, she supposedly evinced deliberate indifference by denying, without analysis, Plaintiff's second grievance. (Id. at 24.) DPS Policy requires a Facility Head or designated staff member to "investigate the grievance." (Docket Entry 49-8 at 3.)

Defendant Locklear handled Plaintiff's first, second, and fourth grievances, which disclosed the following information: Plaintiff feared a gang-related attack; Plaintiff knew (but failed

-47-

to provide) nicknames of potential assailants; staff at Plaintiff's last camp possessed information about the hit on his life; Plaintiff had grieved the issue before and renewed his request for protective custody; Plaintiff had shared with Defendant Gaddy information to support his request; Plaintiff objected to the comfort and cleanliness of SCI; prison staff mishandled Plaintiff's grievances; Plaintiff lacked access to a policy manual and law library; staff had denied Plaintiff requests for protection; SCI inmates created homemade weapons; and SCI experienced understaffing. (See Docket Entry 26-9 at 3–5; Docket Entry 26-10 at 2; Docket Entry 26-11 at 2–7.) The Step One responses to the first and second grievances expressed that Plaintiff had failed to provide sufficient information to justify protective custody. (Docket Entry 26-9 at 6; Docket Entry 26-10 at 4.) Defendant Gerald responded to the fourth grievance in similar fashion and further notified Plaintiff that SCI staff conducted five searches per day as well as unannounced facility searches. (Docket Entry 26-11 at 8.)

The record shows Defendant Henderson played a role only with Plaintiff's second grievance. (See Docket Entry 26-10 at 4.) That grievance related only that Plaintiff had grieved the issue before and that he had given information to Defendant Gaddy in support of his renewed protective custody request. (See id. at 2.) Defendant Henderson's Step One response references an investigation by

-48-

McDonald, who recommended denial of Plaintiff's second protective custody request. (Id. at 4; Docket Entry 26-4 at 2.) Because Plaintiff filed his second grievance close in time to his third request for protective custody, Hammonds's investigation of the latter had concluded before Defendant Henderson provided the Step One response. (See Docket Entry 26-10 at 2 (second grievance received May 21, 2017); Docket Entry 26-5 at 2 (third request for protective custody dated May 25, 2017).) Assuming that Defendant Henderson knew about both McDonald's and Hammonds's reports at the time of her Step One response, she would have known that (i) Plaintiff reported having paperwork documenting his cooperation against Micky Rollins, (ii) Plaintiff feared an attack by a United Blood Nation gang member, (iii) Plaintiff believed that (unidentified) inmates viewed him as a snitch, and (iv) both McDonald and Hammonds deemed this information insufficient to warrant protective custody. (See Docket Entry 26-4 at 2; Docket Entry 26-5 at 6.)

Based on the information reasonably available to Defendants Locklear and Henderson, no reasonable juror could conclude that Plaintiff faced an obvious risk or that Defendants Locklear or Henderson displayed willful blindness. Plaintiff's showing falls short of "a high probability of facts indicating that one prisoner has planned an attack on another." Farmer, 511 U.S. at 843 n.8. Even if Defendants Locklear and Henderson could have taken

-49-

additional action to learn whether Plaintiff faced a real threat —
or even if a reasonable juror could decide that they should have —
their inaction fails to meet the high standard of deliberate
indifference. Plaintiff's wide-ranging complaints suffered from
significant vagueness, and he declined to lend credibility to his
account by offering verifiable details to substantiate his
subjective fears, considerations that preclude relief. See Farmer,
2018 WL 3585208, at *4 ("Not only does that refusal [to identify
his assailants] thwart any honest attempts to address Mr. Farmer's
stated safety concerns, it also detracts from the credibility of
the claims raised."). Presenting his grievance in this manner
deprived Defendants Locklear and Henderson an "opportunit[y] to
obtain . . . confirmation" of any threat to Plaintiff's safety.
Farmer, 511 U.S. at 843 n.8; see also Farmer, 2018 WL 3585208, at
*4 ("While this Court recognizes that naming one's assailants in a
prison setting may involve a degree of risk, correctional officials
cannot be held responsible for allegedly failing to protect an
inmate from perceived enemies if the inmate refuses to cooperate by
identifying the source of the threats."). Because no reasonable
juror could find that Defendants Locklear or Henderson "strongly
suspected," Farmer, 511 U.S. at 843 n.8, an obvious risk to
Plaintiff's safety, they demonstrated no deliberate indifference.
Accordingly, the Court should enter judgment on this basis in favor
of Defendants Locklear and Henderson.

### 3. Defendant Gerald

Plaintiff's summary judgment brief and consolidated response argue that Defendant Gerald failed to appropriately address Plaintiff's concern for his safety despite her knowledge of threats from United Blood Nation gang members. (See Docket Entry 29 at 24; Docket Entry 48 at 26.) Defendant Gerald handled Plaintiff's third and fourth grievances. (See Docket Entry 34-32 at 2 (Step One response to fourth grievance); Docket Entry 34-51 at 2-10 (signature indicating receipt of third grievance).) Like Defendant Locklear, who also played a role in the fourth grievance, Defendant Gerald received notice of Plaintiff's dissatisfaction with the comfort and cleanliness of SCI, prison staff's handling of his grievances, his lack of access to a policy manual and law library, the repeated denials of protective custody, the potential for inmates to create homemade weapons, and the levels of staffing at SCI. (See Docket Entry 26-11 at 2-7.) As with Defendant Locklear, Defendant Gerald's knowledge of those concerns fails to establish any deliberate indifference; no reasonable juror could conclude that Defendant Gerald must have deduced a substantial risk to Plaintiff, based on such matters.

However, Defendant Gerald's knowledge of Plaintiff's situation exceeded that of Defendant Locklear. On May 18, 2017, while Plaintiff's second protective custody request remained pending, Defendant Poole sent a message to Defendant Gerald asking her to

-51-

look into the allegations in the First DPS Letter and to ensure that staff completed an investigation. (Docket Entry 34-36 at 2.) Beyond the belated note entered into the correspondence tracking system more than two years later, the record fails to reflect any action by Defendant Gerald in response to this directive.

Additionally, because Defendant Gerald signed for Plaintiff's third grievance on June 1, 2017, she learned more about Plaintiff's perspective on the situation, including that: (i) two inmates had attacked Plaintiff in spring 2017, (ii) an inmate had threatened Plaintiff's life on May 13, 2017, (iii) Plaintiff's cooperation in 2008 caused United Blood Nation gang members to believe he had snitched on them, (iv) Plaintiff had offered documentation in support of his protective custody request to Defendant Henderson through McDonald, (v) Defendant Ingram had come to Plaintiff's cell demanding that he identify inmates who were threatening him, and (vi) Plaintiff had told "Sgt. Hunt" some names of inmates with whom he had problems and had offered to "identify the others via picture roster." (Docket Entry 34-51 at 2-10.) Neither Defendant Gerald nor any other staff member processed this grievance because another grievance (Plaintiff's second) remained pending at that time. (See Docket Entry 34-52 at 2.) Defendant Gerald testified in her deposition that she could not remember what action she took, if any, in response to the information contained in Plaintiff's third grievance. (Docket Entry 34-16 at 7.)

On this record, a reasonable juror could conclude that Defendant Gerald actually realized the risk posed to Plaintiff's safety (though Plaintiff's articulated fear, on its own, fails to establish an objective risk). Nonetheless, the record contains insufficient evidence from which a reasonable juror could find that Defendant Gerald "actually . . . recognized that [her] actions were insufficient." Parrish ex rel. Lee, 372 F.3d at 303. As with other aspects of the deliberate indifference standard, "it is not enough that the official *should have* recognized that his actions were inappropriate." Id. (emphasis in original). When Plaintiff expressed these concerns to Defendant Gerald, staff had begun processing Plaintiff's second grievance and his third request for protective custody. Defendant Gerald need not have believed these measures would fail to adequately address the issue. For this reason, the Court should grant the DPS Motion with respect to Defendant Gerald.

### 4. Defendant Ingram

Per Plaintiff, Defendant Ingram's deliberate indifference hinges on his lack of investigation into and eventual denial of Plaintiff's first protective custody request. (Docket Entry 29 at 20, 24.) Plaintiff's initial statement notified Defendant Ingram that, in 2008, staff had transferred Plaintiff from SCI because of a threat to Plaintiff's life by the United Blood Nation gang. (Docket Entry 34-12 at 2.) Plaintiff represented to Defendant

Ingram that the "issue" persisted and that Plaintiff feared for his life.  (Id.)  Defendant Ingram limited his investigation to a review of Plaintiff's statement, which failed to identify any inmates who had threatened him.  (See Docket Entry 34-6 at 4–18.)

Plaintiff's statement alone falls short of allowing the inference that Defendant Ingram actually perceived a substantial risk to Plaintiff's safety or that Defendant Ingram willfully provided an inadequate response.  As in Mbewe and Brown, Plaintiff offered scant information, which cuts against the credibility of the threat and prevents further investigation or verification.  A reasonable juror could not determine that Defendant Ingram recognized a substantial risk solely because Plaintiff communicated his subjective fear.  Therefore, the Court should grant the DPS Motion as it relates to Defendant Ingram.

5. Defendant Gaddy

Plaintiff's summary judgment brief asserts that Defendant Gaddy displayed deliberate indifference by denying Plaintiff's first grievance without a proper investigation, despite the information available to Defendant Gaddy.  (See Docket Entry 29 at 20–21, 24).  In particular, Plaintiff highlights that Defendant Gaddy declined to call Plaintiff's prior facility, that he showed Defendant Gaddy "documentation of the threats against him," and that Defendant Gaddy held the position of "[security risk group] sergeant."  (Id. at 24; Docket Entry 48 at 25.)

-54-

Because Defendant Gaddy handled Plaintiff's first grievance, he learned the following information: staff had denied Plaintiff protective custody for failing to identify any potential assailants; Plaintiff feared that a gang would send someone to stab or cut him; Plaintiff knew only nicknames of the inmates who threatened him; Plaintiff resided at SCI in 2008 before staff "shipped" him out as a result of threats from United Blood Nation gang members; staff at "CCI" possessed information about the hit on Plaintiff's life and asked him to sign a statement. (Docket Entry 34-17 at 2-4.)

As compared to the corresponding protective custody request, the first grievance adds few additional details and fails to correct the identified deficiency: Plaintiff's refusal to name inmates who posed a risk to his safety (despite Plaintiff's admission that he knew their nicknames). As in Brown, Plaintiff declined to provide information that Defendant Gaddy could have used to verify any threat or confirm the justification for Plaintiff's fear. No reasonable juror could determine, based on Plaintiff's generalized concerns, that Defendant Gaddy recognized a substantial risk of serious harm or that he failed to avert a danger despite his ability to do so. As a result, the Court should grant the Gaddy Motion.

-55-

## E. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Because Plaintiff cannot establish that the DPS Defendants or Defendant Gaddy violated Plaintiff's eighth-amendment rights, qualified immunity protects those Defendants from liability.[11]

## F. The New Sealing Motions

In connection with their summary judgment motions, both parties previously sought to seal certain materials. (See Docket Entry 32 ("Plaintiff's Motion for Leave to File Under Seal Portions of Plaintiff's Brief in Support of his Motion for Summary Judgment and Exhibits Attached Thereto"); Docket Entry 38 ("DPS Defendants' Motion to Seal Certain Exhibits Filed in Support of Motions for Summary Judgment"); Docket Entry 39 ("Memorandum of Law in Support

---

[11] The Fourth Circuit has "long . . . recognized the 'special problem' raised when the objective qualified immunity standard is applied to an Eighth Amendment violation that requires wrongful intent in the form of 'deliberate indifference.'" Brooks v. Johnson, 924 F.3d 104, 119 n.6 (4th Cir. 2019) (quoting Rish v. Johnson, 131 F.3d 1092, 1098 n.6 (4th Cir. 1997). Some "courts have held that when forecasted evidence is adequate to raise a genuine issue of fact concerning a prison official's unreasonable response to actual knowledge of a substantial risk of harm, the qualified immunity inquiry drops from the case." Rish, 131 F.3d at 1098 n.6.

-56-

of DPS Defendants' Motion to Seal").)[12]  Upon review, United States District Judge Loretta C. Biggs granted the DPS Defendants' sealing motion (Docket Entry 38) and sealed the following documents: Docket Entries 24, 26, 26-3 through 26-7, 26-9 through 26-16, 29, 33, 34, 34-1 through 34-55, and 35.  (Docket Entry 43.)[13]

The New Sealing Motions propose sealing of additional briefs and related attachments.  Specifically, DPS Defendants seek to maintain under seal their response (Docket Entry 47)[14] opposing Plaintiff's summary judgment motion.  (Docket Entry 46 at 1.)  For his part, Plaintiff requests that the following documents remain under seal: (1) his consolidated response (Docket Entry 51) opposing the DPS Defendants' and Defendant Gaddy's respective motions for summary judgment; (2) four exhibits (Docket Entries 52-1, 52-2, 52-3, and 52-4) filed in connection with Plaintiff's consolidated response; and (3) Plaintiff's reply (Docket Entry 56) in support of his own summary judgment motion.  (Docket Entry 50 at 1–2; Docket Entry 55 at 1–2.)  As grounds for sealing such documents, DPS Defendants have invoked Rule 10(c) of the Federal

---

[12]    In accordance with this Court's Local Rule 5.4, DPS Defendants filed a memorandum in support of Plaintiff's sealing motion (Docket Entry 32) as well as their own motion (Docket Entry 38), given DPS Defendants' status as "the party claiming confidentiality."

[13]  The above-cited Order thereby granted the relief sought by Plaintiff's sealing motion (Docket Entry 32).

[14]  DPS Defendants erroneously cite Docket Entry 44, the public, redacted version of their response.

Rules of Civil Procedure, thus incorporating by reference the earlier-filed memorandum (Docket Entry 39) in support of the since-granted motion to seal (Docket Entry 38), and forecasted the filing of an additional memorandum in support of the New Sealing Motions. (See Docket Entry 46 at 2.)

However, DPS Defendants filed no such memorandum. (See Docket Entries dated Aug. 10, 2020, to present.) The earlier-filed memorandum fails, on its own, to justify the New Sealing Motions, as it presents no tailored justifications for sealing the later-filed record materials. (See Docket Entry 39.) This Court's Local Rule 5.4(d) provides for denial of a motion to seal when "the party claiming confidentiality fails to file a Brief." As a result, the Court should deny the New Sealing Motions without prejudice to submission of a new, properly supported sealing motion.

Additionally, the previously sealed material (and some material addressed by the New Sealing Motions) plays a critical role in the above analysis of summary judgment issues in that the Recommendation discusses the contents of several sealed exhibits (and items proposed for sealing). For that reason, the undersigned redacts the Recommendation consistent with the Court's Order sealing Docket Entries 24, 26, 26-3 through 26-7, 26-9 through 26-16, 29, 33, 34, 34-1 through 34-55, and 35. (See Docket Entry 43.) However, "the First Amendment right of access extends to a judicial opinion ruling on a summary judgment motion." Company Doe

-58-

v. Public Citizen, 749 F.3d 246, 267 (4th Cir. 2014). "The generalized need for public access reaches its apex when a matter has reached the adjudication stage." Berliner Corcoran & Rowe LLP v. Orian, 662 F. Supp. 2d 130, 133 (D.D.C. 2009); see also In re McCormick & Co., MDL Docket No. 2665, 2017 WL 2560911, at *1 (D.D.C. June 13, 2017) ("The presumption in favor of public access is especially strong for judicial orders and opinions."); Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc., No. 09 Civ. 3961, 2010 WL 339784, at *1 (S.D.N.Y. Jan. 25, 2010) (noting that judicial opinions directly affect adjudication). "Redacting statements that are critical to a court's analysis would substantially impede the public right of access to judicial opinions." In re McCormick & Co., 2017 WL 2560911, at *1. In light of the foregoing principles, the undersigned recommends that the Court permit public access to the unredacted Recommendation, if adopted.

CONCLUSION

Defendants Poole, Locklear, Henderson, Gerald, Ingram, and Gaddy have established entitlement to judgment as a matter of law on Plaintiff's individual-capacity claims. Only the official-capacity claims against Defendants Lassiter and Ishee should survive summary judgment. Additionally, the New Sealing Motions lack adequate support on this record, as DPS Defendants filed no supportive brief and otherwise offered no justifications specific

to the materials they seek to seal.  Finally, the redactions above reflect the current state of the public record, but the undersigned recommends disclosure to the extent necessary to explain the basis for the Court's ultimate ruling.

**IT IS THEREFORE RECOMMENDED** that the DPS Motion (Docket Entry 23) be **GRANTED** with respect to Defendants Poole, Locklear, Henderson, Gerald, and Ingram.

**IT IS FURTHER RECOMMENDED** that the Gaddy Motion (Docket Entry 36) be **GRANTED.**

**IT IS FURTHER RECOMMENDED** that Plaintiff's Motion (Docket Entry 28) be **DENIED.**

**IT IS FURTHER RECOMMENDED** that the New Sealing Motions (Docket Entries 46, 50, 55) be **DENIED WITHOUT PREJUDICE** to the filing of a new sealing motion after the Court has determined what disclosures must occur in connection with the resolution of the summary judgment motions.

**IT IS FURTHER RECOMMENDED** that the Court authorize public docketing of the unredacted version of this Recommendation.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**

November 18, 2020

-60-
